**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **VERONICA DASS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 08 C 6045** |
| **v.** | ) | |
| | ) | |
| **CHICAGO PUBLIC SCHOOLS, CHICAGO** | ) | **JUDGE DAVID H. COAR** |
| **BOARD OF EDUCATION, and PAULA** | | |
| **JESKE** | | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Veronica Dass brings this action against Defendants Chicago Public Schools ("CPS"), the Chicago Board of Education (the "Board"), and Paula Jeske ("Jeske") (collectively "Defendants"), alleging that CPS and the Board discriminated against her on the basis of her national origin and retaliated against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* (Counts I and II), Jeske discriminated against her in violation of 42 U.S.C. § 1981 (Count III), and CPS and the Board discriminated against her in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* (Count IV). Dass also brings state-law claims of intentional infliction of emotional distress ("IIED") against Jeske (Count V), and breach of contract and promissory estoppel against CPS and the Board (Counts VI and VII). Defendants move for summary judgment on all claims. For the reasons stated below, Defendants' motion for summary judgment is GRANTED as to Counts I-IV.

## BACKGROUND

Plaintiff Veronica Dass was born in Hyderabad, India, where she began her career in teaching before moving to the United States and becoming a naturalized citizen. Since Dass was

first hired by the Board of Education in 1991, she has held various teaching positions in the Chicago Public Schools System, mostly in the primary grades (i.e., kindergarten through third grade). In 2002, Dass was hired by Aleen Donaldson, who was the principal at Pablo Casals Elementary School ("Casals"). After Dass regularly filled in for a Casals teacher who was on extended medical leave, Donaldson hired her without subjecting her to any formal interview process. Dass is certified by the State of Illinois to teach any grade between kindergarten and eighth grade. She is also certified as "highly qualified" to teach various subjects to students in those grades, including math, reading, language arts, and science.

### Dass's Performance Under Donaldson (2002-2005)

From the time she hired Dass in 2002 until her retirement in June 2005, Donaldson had the opportunity to observe Dass's performance. Donaldson's observations led her to rate Dass's overall performance as "excellent" on her annual teacher evaluations for the 2002-03, 2003-04, and 2004-05 school years.[1] (Defendant's Rule 56.1 Statement of Material Facts ("DSOF")- Tab I, Aleen Donaldson Dep. 95:9-96:21, Exs. 2, 4, 49, Sept. 24, 2009.) In 2002-03, Dass taught second grade. On her annual evaluation for that year, Donaldson described Dass's strengths as "excellent applications of learning theories practiced in the classroom." (*Id.* at Ex. 2.) Beneath the section of the evaluation form devoted to weaknesses, Donaldson wrote, "improving in positive self concept and acceptance of teaching role." (*Id.*) At her deposition, Donaldson explained that this comment meant that Dass needed to take control and ownership over her classroom. (*Id.* at 43:16-44:7.) For the 2003-04 school year, during which Dass taught third grade, Donaldson's assessment of Dass's strengths included her "excellent knowledge of the curriculum and application at the grade level" and "[g]ood management and support of school-related projects and activities." (*Id.* at Ex. 49.) She made no notes in the "weaknesses" section.

---

[1] The rating options are "superior," "excellent," "satisfactory," and "unsatisfactory."

(*Id.*)  The same year, Donaldson singled Dass out for praise at a staff meeting because of her students' exemplary scores on the Iowa standardized test.  (Plaintiff's Rule 56.1 Statement of Material Facts ("PSOF")- Ex. 1, Dass Decl. ¶ 4, Dec. 13, 2009; DSOF- Tab K, Bennie Bonaminio Dep. 85:19-86:9, Sept. 8, 2009.)  In 2004-05, Dass continued to teach third grade. Donaldson's annual review of Dass's performance that year described her as "knowledgeable, constant in management and classroom structure."  (*Id.* at Ex. 4.)  For weaknesses, Donaldson wrote only that Dass "must achieve a more independent style of team identity."  (*Id.*)

At her deposition, Donaldson testified that Dass "was never really a strong disciplinarian," and explained that she lacked a strict or consistent disciplinary procedure.  (*Id.* at 102:1-3; 39:18-40:1.)  As evidence of Dass's struggle with discipline, Donaldson testified that she had to provide Dass with assistance when she was teaching second grade in 2002-03.  (*Id.* at 45:4-24, 61:20-63:12.)  Specifically, Donaldson provided Dass with extra training in "direct instruction" and later paired her with a stronger teacher for continued support.  (*Id.*)  Donaldson maintains that it's possible to be a strong teacher, but not a strong disciplinarian, and credits Dass with "excellent knowledge of the curriculum," good management, and positive marks for supporting school-related activities.  (*Id.* at 102:14-23.)

Donaldson never recommended Dass for tenure, and just before she retired at the conclusion of the 2004-05 school year, Donaldson non-renewed Dass for the 2005-06 school year.  Dass lost her teaching position, but reapplied to Casals.  Following Donaldson's retirement, Casals had an interim principal for several weeks at the start of the 2005-06 school year, and Paula Jeske became Casals's principal in September 2005.  Although Donaldson did not restore Dass's position before she retired, Dass was rehired (presumably by the interim

principal) to teach at Casals, and she was assigned to teach fifth grade for the 2005-06 school year.

## Dass's Performance Under Jeske (2005-2006)

Jeske made three formal observations of Dass during the 2005-06 school year—on January 10, April 28, and May 16, 2006. (DSOF ¶ 13, 18, 25). After her first observation on January 10, Jeske's review of Dass's performance was generally positive; out of the 30 applicable categories on Jeske's classroom visitation form, Jeske checked the "strength" column in all but three. (*Id.* at Tab N.) In her written comments, Jeske indicated that Dass is "very cooperative, frequently offers to help others," and "makes many positive comments to students." (*Id.*) On the negative side, Jeske indicated that Dass needed "to improve classroom management so lessons are actively participated in by students" and similarly indicated that Dass was "in need of great improvement" in establishing and maintaining reasonable rules of classroom conduct consistent with the school's discipline code. (*Id.*) Although Jeske testified that Dass's teaching methods were outdated, Dass disputes this characterization. (*Compare* DSOF ¶ 14 *with* PSOF-Ex. 1, Dass Decl. ¶ 5.)

Jeske conducted her second formal observation during Dass's language arts class on April 28, 2006. (DSOF- Tab O.) Jeske's review of Dass's performance after this observation was far more negative than her first review. (*Compare* DSOF- Tab N *with* DSOF-Tab O.) In addition to marking a number of weaknesses, Jeske commented that Dass's "English lesson on sentences is fragment[ed]" and "many, many students off task, kids speak out at will." (*Id.*; Tab D, Paula Jeske Dep. 182:4-18, Aug. 3, 2009.) She noted additionally that "kids were shooting rubber bands, dancing, talking, out of seats, drawing, brushing hair." (DSOF- Tab O.) On May 3, 2006, Jeske met with Dass, gave her a copy of the observation form from April 28, and

discussed it with her. Dass claims that, during this meeting, Jeske suggested that she should start looking for another job "on the North side where most of the Indian kids go." (DSOF ¶ 20.) Jeske denies that she made this comment. (*Id.* at ¶ 21.)

On May 16, 2006, Jeske conducted her final observation of Dass's classroom for the school year. Jeske stated in her notes that, of the 22 students present, only seven were following along with Dass. (DSOF ¶ 25.) Jeske noted specifically that three boys were up from their seats throwing paper balls, one boy and one girl were hitting each other, one boy was fanning himself with a book, two boys were making paper animals, one boy was sitting backwards in his chair, and one girl was doing her hair. (*Id.*) Jeske observed that Dass did not reprimand any of them; rather, after ten minutes of working on the overhead projector, Dass said "somebody is talking in the back," then returned to writing on the overhead projector. (*Id.*)

Aside from Jeske, other staff members observed Dass's difficulties managing her classroom. Throughout the 2005-06 school year, Dass received assistance from Renee Mackin, the school's lead literacy teacher, who would model lessons for Dass and provide her with extra support. (DSOF ¶ 15.) Mackin began by spending about an hour each week in Dass's classroom and eventually increased her presence to approximately five hours per week as the state's standardized testing date approached. (*Id.*-Tab E, Renee Mackin Dep. 62:8-63:19, Sept. 3 2009.) During the time she spent in Dass's classroom, Mackin noticed that Dass seriously struggled with classroom discipline and discussed her concerns about Dass's performance with Jeske. (DSOF ¶ 15.) Mackin also testified that she had to spend a disproportionate amount of her time in Dass's classroom; during the period that she spent approximately five hours per week in Dass's classroom, she was spending only one hour per week in each of the 15 other classrooms for which she was responsible. (*Id.* at 63:16-19; 65:11-23).

At least three times per week, Dass called Jose Candelario, one of the school's security officers, to her classroom. Candelario helped Dass with fights, tables and objects being thrown, abusive language directed toward her, and students walking out of class. Candelario testified that he would respond to Dass's requests for help by escorting unruly students either to the principal's office or to the classrooms of two other teachers who had agreed to take in Dass's students temporarily when she was unable to control them. (DSOF ¶ 17.) According to Candelario, Dass consistently had problems with the same three or four students, and her students also behaved poorly outside of her presence. (*Id.* at Tab F, Jose Candelario Dep. 53:7-14; 101:7-23, Sept. 1, 2009.)

At the conclusion of the 2005-06 school year, Jeske gave Dass an "unsatisfactory" rating on her annual evaluation. (*Id.* at Tab Q.) On the evaluation form, Jeske noted the following weaknesses: "very poor classroom management, frequent discipline referrals, most of the students are off task during class, teacher does not follow suggestions made by administration." (DSOF ¶ 26.) Dass denies that she ignored the administration's suggestions and claims that she made every effort to comply with administrative rules and guidelines. Dass admits, however, that as a fifth-grade teacher, she had difficulty managing and disciplining students. (*Id.* at ¶ 27.) She testified that, during the 2005-06 school year, some of her students used rubber bands to shoot crayons at each other, and as soon as she turned her back to the class or took a momentary pause, her students began misbehaving by throwing paper balls at each other or fighting. (*Id.*) Dass admits that her students also engaged in other forms of misbehavior, the specifics of which she does not recall. (*Id.*)

### Dass's Non-Renewal

From 2002 until June 30, 2004, Dass worked at Casals as an "FTB," a Full-Time Basis substitute teacher. (DSOF ¶ 7.) As of July 1, 2004, all FTBs were reclassified as either Probationary Assigned Teachers ("PAT") or Temporary Assigned Teachers ("TAT") under the terms of a new collective bargaining agreement ("CBA") between the Chicago Teachers Union and the Board.[2] The Board's Department of Human Resources ("HR") oversees the classification and tracking of teachers' status and seniority. Each year, HR sends principals a list of all teachers classified as PATs so that the principals can decide which PATs they wish to retain and which they wish to non-renew. (*Id.* at ¶ 29.) Although Dass was a PAT during the 2005-06 school year, HR erroneously classified her as a TAT. (*Id.* at ¶¶ 28, 30.) As a result of this error, Dass did not appear on the list of PATs sent to Jeske in the spring of 2006. (*Id.* at ¶ 30.) While erroneously classified as a TAT, Dass was displaced by HR when Casals lost six teaching positions due to declining student enrollment projections for the 2006-07 school year. (*Id.* at ¶ 31.) It is undisputed that, because of the misclassification, Jeske had no role in the decision to displace Dass. (*Id.*) Dass grieved her displacement, claiming that she had been classified erroneously and should be returned to Casals. (*Id.*) Although Jeske agreed that Dass had been classified erroneously, she did not believe that Dass should be reinstated and sent a series of e-mails to HR employees in a vigorous effort to prevent Dass from returning to Casals. (*See* PSOF-Tab X.)[3] Dass argues that a line in one of these e-mails corroborates the discriminatory intent reflected by Jeske's alleged comment in May 2006; in Jeske's October 14,

---

[2] The new CBA defines PATs as full-time teachers serving the probationary period set forth in 105 ILCS 5/34-84. (*Id.* at ¶ 8.) Teachers in their first, second, or third year of probationary service can be terminated without reason at least 30 days before the end of the school year. (*Id.*) Teachers in their fourth year of probationary service must be afforded a reason for termination at least 30 days before the end of the school year. (*Id.*)

[3] In one e-mail to a Board representative, Jeske stated that she believed the Board had erred in designating Dass as a TAT and that Jeske "should not have to pay for it." (PSOF ¶ 22.)

2006 e-mail to HR, which generally communicated that she did not wish for Dass to return to

Casals, Jeske wrote: "I need a Spanish bilingual teacher before my audit on Nov. 1. Dass is

fluent in 4 Indian languages and would probably help a school with an Indian population meet its

bilingual audit." (PSOF- Ex. X at CPS27.)[4] Jeske denies that this comment was discriminatory

and contends that, in addition to leveraging Dass's language skills, sending her to another school

would potentially enable her to teach smaller, more manageable ESL classes.[5] In any event,

despite Jeske's efforts, the Board determined that Dass had been misclassified and should be

returned to Casals.

After much confusion, Dass was reinstated and assigned to teach seventh grade at Casals

beginning in November 2006. (DSOF ¶ 32.) Before Dass, Carla Miller taught her seventh-grade

class from August 2006 until September 2006, and Erin Yost took over until Dass was reinstated

in November. At that point, Jeske moved Yost to an open third-grade class and placed Dass in

the seventh grade.[6] Although Dass believes that Jeske assigned her to seventh grade as a way of

setting her up to fail, Jeske offers a series of legitimate explanations for her decision. First, Jeske

claims that, before Dass was reinstated, she had planned to move Yost to third grade and hire a

new bilingual teacher for seventh grade. Jeske explained at her deposition that Casals needed a

teacher who possessed a State of Illinois endorsement in Spanish to comply with the upcoming

audit related to the school's federally mandated ESL services. (*Id.* at ¶¶ 34-36.) Jeske was

---

[4] Jeske is presumably referring to an upcoming audit by the U.S. Department of Justice and the Board's Office of Language and Cultural Education to ensure that the school complied with requirements concerning the provision of English as a Second Language ("ESL") services by appropriately credentialed teachers. (*See* DSOF ¶ 34; *see also* Dkt. 42- Def.'s Reply Br. at 1-2.)

[5] As evidence of her non-discriminatory intentions, Jeske claims that, when Dass expressed concern about difficulties finding a position in August 2006, before she was reinstated, Jeske suggested that Dass apply for positions that would leverage her certification as an ESL teacher, her endorsement in Hindi, and her fluency in four Indian languages, which she believed to be relatively uncommon. (DSOF ¶ 22.) Jeske testified further that, in her opinion, Dass is best suited to teach "pull-out" ESL programs tutoring three or four students at a time. (*Id.* at ¶ 23.) Dass denies that she communicated with Jeske in August 2006. (DSOF ¶ 24.)

[6] By the time Dass was reinstated in November 2006, Casals had regained a number of the positions lost at the end of the 2005-06 school year as a result of increased enrollment. (DSOF ¶¶ 36-37.)

unable to hire a new bilingual teacher due to Dass's reinstatement. In any event, Jeske claims that she moved Yost from seventh to third grade, rather than placing Dass in the open third-grade class, because she considered Yost to be a superior teacher. (*Id.* at ¶ 38.) Jeske explains that she was compelled to place the stronger of the two teachers in third grade because it is a "bridge" grade, or critical testing year. (*Id.*) Jeske also claims that she received input from Mackin, who told her that Dass had serious problems with her earlier third-grade classes. (*Id.*) Reports from staff members such as Mackin led Jeske to believe that Dass's performance teaching third grade was no better than the poor fifth-grade performance that Jeske had personally observed. (*See* Jeske Dep. 64:1-4.) Additionally, Jeske explains that Yost had been trained in DIBELS and Reading First, two new programs for primary grades, and Dass had not.[7]

Dass challenges the veracity of Jeske's purported explanations. She points out that, unlike Dass, Yost had no previous full-time experience teaching third grade. (DSOF- Tab J, Erin Yost Dep. 61:3-17, Sept. 8, 2009.) Additionally, the parties agree that Yost struggled with discipline. (Jeske 52:4-5.) Although Jeske testified at her deposition that, when she observed Yost's seventh grade classroom, Yost "appeared to be very knowledgeable" and "seemed to be making a very strong effort to improve from week to week" (*Id.* 52: 1-9), Jeske's contemporaneous reviews of Yost's performance identified numerous weaknesses in her teaching and noted specifically that Yost struggled with classroom management. (PSOF- Ex. Z, Yost Reviews, CPS01366-01367, 01370.) In fact, based on her perception of Yost's performance in the seventh grade, Jeske decided not to renew her at the conclusion of the 2005-06 school year. (Jeske Dep. 272:2-11.) With respect to Jeske's emphasis on Yost's Reading

---

[7] The Reading First program was funded by a federal grant of approximately $1,000,000 to Casals over three years. Jeske explained during her deposition that, to ensure continued funding, the program required strict adherence to its curriculum. (DSOF ¶ 39.) Given Dass's lack of training in the DIBELS assessment that corresponded with the program, and her difficulty maintaining order in her classroom, the administration did not deem Dass to be a good candidate for participation in the program. (*Id.*)

First training, Dass claims that Yost was not trained in the program until after she began teaching third grade at Casals.[8]  In response to an interrogatory asking why she reassigned Yost to third grade, Jeske made no mention of Reading First.  (*See* Jeske Dep. Ex. 22.)  Rather, she explained that Yost was overall a better candidate than Dass, and "[g]iven the type of reactions to her that pubescent boys in her seventh grade classroom exhibited, I decided that a primary grade assignment would be more appropriate for her."  (*Id.*)  Jeske explained further in her deposition that Yost is a "very attractive woman," and some of the male students in her seventh grade class made inappropriate comments to her.  (Jeske Dep. 43:14-44:1.)

## Dass's Seventh Grade Performance

Dass returned to Casals and took over Yost's seventh-grade class at some point between November 6 and November 14, 2006.[9]  On November 16, assistant principal Bennie Bonaminio observed Dass's classroom at three different points throughout the day, each time at Jeske's request.  (Bonaminio Dep. 73:6-75:20.)  Jeske herself observed Dass's classroom on November 29, 2006, also entering the room on three different occasions during the day.  (Jeske Dep. 225:20-226:12.)  Jeske explained that these evaluations serve to inform teachers of areas in need of improvement.  (Jeske Dep. 226:13-227:24.)  Contrary to Jeske's testimony, Dass contends that these evaluations were performed to humiliate and retaliate against her, and to create a paper trail so that Jeske could force her out of her teaching position.  (PSOF ¶¶ 15-17; Pl.'s Resp. to DSOF ¶ 43.).  In support of this contention, Dass points out that no other teachers have been observed after such a short period of time in the classroom.  While Bonaminio observed Dass just days

---

[8] Dass supports this proposition by citing, in part, to a page of Yost's deposition that is missing from her submission (page 30).  Although the transcript is not entirely clear, Yost seems to testify that she was trained in Reading First in 2006.  (Yost Dep. 29).  There is no more precise information on when Yost's training occurred.  The Court notes that all even-numbered pages of Yost's deposition transcript are missing.

[9] Dass testified that she returned to Casals on November 13 or 14, while Jeske testified that Dass returned on November 6.  (Dass Dep. 192:10-13; Jeske Dep. 215:3-5.)

after she began teaching seventh grade, he has never observed any other teachers during their first two weeks in the classroom. (Bonaminio Dep. 57:19-22.) For her part, Jeske observed Yost's seventh grade classroom for the first time on October 27, 2006 after Yost began teaching seventh grade in September. (Yost Dep. 43:12-45:3; PSOF- Ex. Z, Yost Reviews, CPS01366-01367, 01370.) Dass also claims that, during her observation, Jeske allowed the students to peer over her shoulder and view her written criticisms of Dass, thereby undermining Dass's authority. (Dass Dep. 202:11-209:9).

During their observations, both Bonaminio and Jeske noted that Dass suffered from significant weaknesses in her classroom management, discipline, and instruction. (DSOF ¶ 44.) Bonaminio's first evaluation, at 10:04 a.m. on November 16, 2006, noted that Dass lacked control of the classroom, security had already been called twice before his arrival, students were walking around and using inappropriate language, very few students were actively working on an assignment, and they seemed to lack direction or purpose. (*Id.* at ¶ 49.) Notes from Bonaminio's two visits later that day recorded similar examples of Dass's poor classroom management. (*Id.* at ¶¶ 51-52.) According to Bonaminio, Dass's inability to establish a clear-cut direction or rapport with students created a classroom environment where very little teaching could take place. (*Id.* at ¶ 55.) In his opinion, Dass's failure to provide structure in her classroom caused her students to misbehave. (*Id.*) Dass admits that Bonaminio's observations accurately reflect what occurred in her classroom. (*Id.* at ¶ 56.)

Dass testified that, when Jeske arrived to observe her performance in November 2006, her classroom floor was littered with books because her students had been throwing them at each other earlier that morning. (DSOF ¶ 75.) According to Dass, the classroom was in mayhem when Jeske walked in; some students were playing with their MP3 players while others were

sitting in groups, and none were responding to Dass's efforts to direct them back to their assigned seats. (*Id.*) On November 29, 2006, Jeske visited Dass's classroom on three separate occasions and completed an evaluation form marking 28 checks in the "weakness" column and just four in the "strength" column. (DSOF- Tab T, Classroom Teacher Visitation Form.) In the written portion of the form, Jeske noted the following: Dass offered no instruction, explanation, or assistance to the students; most students were off-task; during one class, only two students were doing the assigned work; at one point, six kids were wandering around the classroom at will; and kids were frequently being sent out of the classroom for band aids and tissues. (DSOF ¶ 58.) Jeske and Dass met to discuss the November 29 observation on December 1, 2006. (*Id.* at ¶ 59.) During their meeting, Dass refused to sign to acknowledge receipt of her evaluation form because she believed Jeske treated her unfairly by allowing her students to view her written criticisms. (Dass Dep. 204:17-210:19.) Dass testified that this interaction with Jeske caused her emotional distress.

In addition to Jeske and Bonaminio, Mackin and Candelario observed that Dass struggled to manage her seventh-grade classroom. Mackin, who had also worked with Dass when she taught fifth grade, set up a classroom library in Dass's seventh-grade class and visited Dass's class approximately once a week to model effective teaching strategies. (DSOF ¶ 45.) During her visits, Mackin noticed that Dass had more discipline and classroom-management problems than other seventh-grade teachers. (*Id.*) For example, she observed Dass's students out of their seats, throwing things at each other, and off-task. (*Id.*) Mackin told Jeske she believed that Dass was a weak teacher. (*Id.* at ¶ 46.) Additionally, Candelario spent an inordinate amount of his time stemming disciplinary problems with both Dass's fifth and seventh-grade students. (*Id.* at ¶

47.)  While other seventh-grade teachers struggled with discipline, Candelario had more problems with Dass than other teachers.  (*Id.*)

Dass admits that, while she served as a seventh-grade teacher, her classroom was out of control, as her students did not pay attention to her and were disruptive.  (*Id.* at ¶ 60.)  She admits that she experienced difficulty managing her classroom every single day.  (*Id.*)  On two or three occasions during the 2006-07 school year, Dass admitted to Jeske that she could not handle her duties as a seventh-grade teacher.  (*Id.* at ¶ 61.)  Dass believes that, in addition to placing her in a seventh-grade class that she knew was disruptive, Jeske set her up to fail by depriving her of an overhead projector and failing to offer assistance with students who misbehaved.  (PSOF ¶¶ 8-9, 11-13.)[10]

### Dass's Medical Leave

At Dass's request, the Board granted her medical leave from December 4, 2006 until June 18, 2007.  (DSOF ¶ 63.)  Dass began her medical leave on December 4, 2006 and did not return to Casals for the remainder of the school year.  (*Id.*)  While Dass was on medical leave, in late March or early February, Jeske recommended to the Board that Dass be non-renewed for the 2007-08 school year.  (*Id.* at ¶ 64.)  Jeske testified that she made this decision during the limited timeframe that the CBA provides for non-renewing probationary teachers.  (*Id.* at ¶ 65.)  The reasons Jeske gave for non-renewing Dass, which she selected from a computer program dropdown list, included lack of subject matter proficiency and failure to improve in setting and maintaining standards for student conduct.  (*Id.*; Pl.'s Resp. to DSOF ¶ 66.)  Jeske also non-renewed Yost (even though she believed that Yost was very knowledgeable and showed great improvement) because she anticipated losing another third-grade position.  (*Id.* at ¶ 64.)  In April

---

[10] Although Dass claims that "the overhead projector was a key tool in maintaining some kind of order in [her] classroom" (PSOF ¶ 9), Dass testified that her fifth-grade students misbehaved when she used an overhead projector (Dass Dep. 128:3-10).

2007, Dass received a notice from the Board stating that, after her return from medical leave, her employment would terminate on August 24, 2007.  (*Id.* at ¶ 66.)  Board rules and policies allow for the non-renewal of probationary teachers on medical leave as long as reasons for non-renewal are not related to the teachers' medical leave.  (*Id.*)  Dass believes that, contrary to these rules and policies, the Board took her leave or disability into account when deciding to non-renew her.  (Dass Dep. 253:5-20.)  As evidence supporting this claim, Dass relies on the timing of her termination and the fact that Jeske was copied on the January 7, 2007 letter from the Board's Employee Health Services department, which acknowledged Dass's request for Personal Illness leave and granted her leave of absence.  (Pl.'s Resp. to DSOF ¶ 68.)

## LEGAL STANDARD

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  If the movant meets this burden, the non-movant must set forth specific facts (a "scintilla of evidence" is insufficient) demonstrating that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 252.

When reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor.  *See Schuster v. Lucent Tech., Inc.*, 327 F.3d 569, 573 (7th Cir. 2003).  At summary

judgment, the "court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact." *Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008).

## ANALYSIS

### I.      Discrimination Under Title VII and 42 U.S.C. § 1981[11]

Under Title VII of the Civil Rights Act of 1964, it is unlawful for an employer to discriminate against an employee "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff can support a claim for discrimination under Title VII either by presenting evidence of discrimination (the "direct method" of proof), or by employing the burden-shifting approach set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) (the "indirect method"). *Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 630 (7th Cir. 2009).

Whether a plaintiff proceeds by the direct or indirect method, she must demonstrate that she has suffered a "materially adverse employment action." *Rhodes v. Ill. Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004). Dass proceeds under both methods, but before turning to either, it is useful to define the materially adverse employment action(s) at issue in this case. Undoubtedly, Dass's non-renewal at the end of the 2006-07 school year constitutes a material adverse employment action. Dass argues that her assignment to teach seventh grade was materially adverse as well. The Court disagrees.

---

[11] The Court will address Dass's claims for discrimination under Title VII and § 1981 together because their methods of proof and elements are "essentially identical." *McGowan v. Deere & Co.*, 581 F.3d 575, 579 (7th Cir. 2009) (citation and internal quotation marks omitted).

A materially adverse employment action is "more than a mere inconvenience or an alteration of job responsibilities." *Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 612 (7th Cir. 2001) (citation and quotation marks omitted). Noting that "not everything that makes an employee unhappy is an actionable adverse action," the Seventh Circuit has recognized three general categories of materially adverse employment actions:

> (1) cases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished, including termination; (2) cases in which a nominally lateral transfer with no change in financial terms significantly reduces the employee's career prospects by preventing her from using her skills and experience, so that the skills are likely to atrophy and her career is likely to be stunted; and (3) cases in which the employee is not moved to a different job or the skill requirements of her present job altered, but the conditions in which she works are changed in a way that subjects her to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in her workplace environment.

*Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1116 (7th Cir. 2009) (internal citations and quotation marks omitted).

Defendants contend that, under *Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720, 728-30 (7th Cir. 2009), Dass's reassignment to teach seventh grade was not materially adverse. In *Lucero*, the plaintiff argued that her reassignment from twelfth to seventh-grade English class was materially adverse because seventh grade is less prestigious than twelfth. The Seventh Circuit rejected her argument and held that "[w]hile Lucero may subjectively believe that teaching High School students is more prestigious than teaching Junior High students, her personal preference is not sufficient to establish an adverse action." *Id.* at 730. After reaching this conclusion, the court went on to caution against allowing federal employment law to become "a mechanism for enforcing employee preferences rather than remedying materially adverse treatment." *Id.*

As Dass properly points out, *Lucero* involved a different set of facts. While Lucero was reassigned from twelfth to seventh-grade English, which she had previously taught successfully, Dass was apparently reassigned to teach seventh grade under less-than-ideal circumstances. By November, she was already the third teacher to assume responsibility for her seventh-grade classroom, and Yost, who was there before her, had had difficulty managing the class. Traditionally a third-grade teacher, Dass suggests that her temperament was better suited to teaching younger students. Nonetheless, Dass cannot avoid the fact that she was certified to teach seventh grade as well as third. In fact, immediately before she was assigned to teach seventh grade, Dass had taught fifth grade under similar circumstances; as with the seventh grade, Dass admittedly struggled to manage her fifth-grade class. Dass does not claim that her assignment to the fifth grade was an adverse employment action. Despite the distinctions between *Lucero* and the instant facts, Dass cannot establish that her assignment to teach seventh grade constituted a materially adverse employment action. Ultimately, she was certified to teach seventh grade, Jeske had the discretion to place her there, and, most significantly, she cannot demonstrate that her difficult fifth-grade class was so different from her difficult seventh-grade class that her reassignment constituted a materially adverse employment action.

Having established that the only materially adverse employment action at issue is Dass's termination in the spring of 2007, the Court proceeds to analyze her claims for discrimination under the direct and indirect methods. Under the direct method, a plaintiff may prevail at summary judgment by presenting evidence from which a jury could find that discrimination motivated the adverse employment action at issue. *See Jones v. City of Springfield, Ill.*, 554 F.3d 669, 671 (7th Cir. 2009). Despite the name, "direct method," a plaintiff proceeding under this method may present either direct or circumstantial evidence that an employer acted based on

discriminatory animus. *See Nagle*, 554 F.3d at 1114; *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008). Direct evidence "will prove the particular fact in question without reliance upon inference or presumption" and usually requires a decisionmaker's admission of discriminatory animus. *Nagle*, 554 F.3d at 1114 (quoting *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720 (7th Cir. 1998)) (internal quotation marks omitted). Because such admissions are rare, *see Nagle*, 554 F.3d at 1114, a plaintiff may also proceed under the direct method by offering circumstantial evidence that "suggests discrimination through a longer chain of inferences." *Atanus*, 520 F.3d at 671 (quoting *Lux v. Baxter Healthcare Corp.*, 467 F.3d 1049, 1053 (7th Cir. 2006)) (internal quotation marks omitted). To succeed under this approach, the plaintiff must "construct[] a 'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the decision-maker.'" *Rhodes*, 359 F.3d at 504 (quoting *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994)). At bottom, regardless of whether the plaintiff presents direct or circumstantial evidence, the direct method of proof focuses on "whether the evidence 'points directly' to a discriminatory reason for the employer's action." *Atanus*, 520 F.3d at 672 (quoting *Sylvester v. SOS Children's Vills. Ill., Inc.*, 453 F.3d 900, 902-03 (7th Cir. 2006)).

Dass contends that Jeske's alleged suggestion that she start looking for another job "on the North side where most of the Indian kids go" is direct evidence that she was terminated because of her national origin. Such a remark can raise an inference of discrimination if it was "(1) made by the decision maker, (2) around the time of the decision, and (3) in reference to the adverse employment action." *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 721 (7th Cir. 2008) (internal citation and quotation marks omitted). Although Dass was first non-renewed shortly after Jeske's alleged comment in May 2006, it is undisputed that Jeske was not involved

in the 2006 decision to non-renew Dass. However, Dass claims that Jeske's alleged remark is direct evidence that Jeske non-renewed Dass for the 2007-08 school year because of her national origin. Despite the ten-month span between Jeske's alleged comment and her decision to non-renew Dass (which occurred in late February or early March 2007), Dass claims that Jeske was on a mission to force Dass out of her job the whole time. Dass notes that, when she was erroneously non-renewed at the end of the 2005-06 school year, Jeske sent numerous e-mails to HR in an effort to prevent Dass from returning to Casals. Dass believes that a line in one of these e-mails corroborates Jeske's discriminatory intent; in an e-mail communicating her preference that Dass not return to Casals, Jeske wrote "I need a Spanish bilingual teacher before my audit on Nov. 1. Dass is fluent in 4 Indian languages and would probably help a school with an Indian population meet its bilingual audit." (PSOF- Ex. X at CPS27.) Dass reads this e-mail in conjunction with Jeske's alleged May 2006 comment as direct proof that Jeske terminated her because she is Indian. Dass argues that Jeske's discriminatory intent is further evidenced by Jeske's decision to place Dass in a disruptive seventh-grade class that would ensure her failure.

Although the Court sympathizes with the challenges Dass faced, the evidence she presents is not the type that "points directly" to a discriminatory reason for her termination. *See Atanus*, 520 F.3d at 672. With the exception of Jeske's alleged comment in May 2006, Dass's evidence could easily support a conclusion that she was fired because of her inadequate performance; it does not prove discrimination "without reliance upon inference or presumption." *See Nagle*, 554 F.3d at 1114. Certainly, Jeske's alleged suggestion that Dass look for another job "on the North side where most of the Indian kids go" is blatantly discriminatory. However, it is not direct evidence that Dass was terminated ten months later because she is Indian. Jeske's alleged comment does not refer to Dass's future termination, and it was not made "around the

time of the decision" to non-renew her. *See Petts*, 534 F.3d at 721. Even where an employer makes a clearly discriminatory comment, "[a] long time period between a remark and an adverse employment action can defeat the inference of a causal nexus between the remark and decision to discharge." *Oest*, 240 F.3d at 611 (internal citation and quotation marks omitted). This is especially so where Dass does not allege that Jeske (or anyone else) made any other comparable comments during the ten months before she was terminated. Moreover, the suggestion of a causal relationship between Jeske's alleged remark and Dass's non-renewal is further weakened by Dass's admitted struggles in the classroom during the intervening period. Although Dass blames her difficulty with the seventh grade on a doomed placement, Dass concedes that she also had great difficulty managing her fifth-grade class. Dass's struggles raise the possibility (and perhaps probability) that she was terminated simply because of her poor performance. Ultimately, despite its offensiveness, Jeske's alleged comment (considered alone or in conjunction with Dass's other evidence) does not prove that Dass was terminated because of her national origin "without reliance upon inference or presumption." *See Nagle*, 554 F.3d at 1114. Because Dass cannot prevail under the direct method, the Court turns to the indirect method.

Under the indirect method, a plaintiff establishes a *prima facie* case of discrimination by demonstrating that: "(1) she is a member of a protected class, (2) her job performance was meeting her employer's legitimate expectations, (3) she was subject to a materially adverse employment action, and (4) the employer treated similarly situated employees outside the protected class more favorably." *Winsley v. Cook County*, 563 F.3d 598, 604 (7th Cir. 2009). If Dass can make out a prima facie case, the burden of production shifts to Defendants to offer a "permissible, nondiscriminatory reason" for her termination. *McGowan v. Deere & Co.*, 581 F.3d 575, 579 (7th Cir. 2009). If Defendants can do so, the burden shifts back to Dass to show

that Defendants' stated reason is "merely a pretext for discrimination, i.e., a lie." *Id.*
Notwithstanding these shifting burdens, Dass bears the ultimate burden of persuading the trier of
fact that Defendants intentionally discriminated against her on the basis of her national origin.
*Id.*

Dass cannot prevail under the indirect method because she has failed to establish that she
was meeting legitimate employment expectations. It is important to note that the analysis here
focuses on Dass's performance at the time of her termination. *See Peele v. Country Mut. Ins.
Co.*, 288 F.3d 319, 328 (7th Cir. 2002). Accordingly, Dass's evidence that she taught third grade
effectively from 2002-2005 is unhelpful.[12] With respect to her performance during the time
leading up to her termination, Dass concedes that she struggled greatly while teaching fifth grade
during the 2005-06 school year, and while teaching seventh grade during the 2006-07 school
year. Indeed, Dass testified that as soon as she turned her back to the class or took a momentary
pause, her fifth-graders began misbehaving by throwing paper balls at each other or fighting,
some of her some of her students used rubber bands to shoot crayons at each other, and they also
engaged in other forms of misbehavior, the specifics of which Dass does not recall. Setting aside
Jeske's reviews of Dass's performance, other CPS employees (to whom Dass does not attribute
discriminatory animus) rated her performance poorly. The school's lead literacy teacher, Renee
Mackin, testified that she observed Dass's struggles with both her fifth and seventh-grade
classrooms. While Dass was teaching fifth grade, in particular, Mackin spent a disproportionate
amount of her time in Dass's classroom (upwards of five hours per week while she was spending
only one hour per week in each of the other 15 classrooms for which she was responsible).

---

[12] Even if it was relevant, the evidence that Dass taught third grade effectively is mixed. On the one hand, her then-principal, Aleen Donaldson, rated her "excellent" on her year-end evaluations for 2002-03, 2003-04, and 2004-05. On the other hand, Donaldson testified that, although a strong teacher, Dass was never a strong disciplinarian. Additionally, Donaldson non-renewed Dass at the conclusion of the 2004-05 school year.

During the time she spent in Dass's fifth-grade classroom, Mackin noticed that Dass seriously struggled with classroom management and discussed her concerns about Dass's performance with Jeske. Additionally, Jose Candelario, a school security officer, testified that he spent an inordinate amount of time stemming disciplinary problems with both Dass's fifth and seventh-grade students. When Dass taught fifth grade, for example, she would call Candelario at least three times per week for help dealing with fights, tables and objects being thrown, abusive language directed toward her, and students walking out of class. Dass cannot establish that she met her employer's legitimate employment expectations in the years preceding her termination, either when she taught fifth or seventh grade. Although she blames her seventh-grade performance on an inappropriate placement and challenging conditions, she offers no excuse for her admittedly deficient fifth-grade performance. Because Dass fails to establish that she met her employer's legitimate expectations at the time of her termination, she cannot prevail under the indirect method.[13] Her claims for discrimination under Title VII and § 1981 therefore fail.

## II.        Retaliation Under Title VII

Dass next claims that Defendants CPS and the Board retaliated against her for grieving her erroneous classification and resulting non-renewal at the conclusion of the 2005-06 school year. This claim falls short as well. As with other discrimination claims, a plaintiff can establish a *prima facie* case of retaliation through either the direct or indirect method. *Antonetti v. Abbott Labs.*, 563 F.3d 587, 592 (7th Cir. 2009). To survive summary judgment under the direct method, Dass must present sufficient evidence from which the jury could infer a "causal link"

---

[13] Although the Court need not consider the other elements of Dass's *prima facie* case, it bears noting that Dass cannot establish that similarly situated non-Indian employees were treated any differently than she was. Although she claims that Jeske treated Yost (Caucasian and of American origin) more favorably than her, Yost was first assigned to the same seventh-grade classroom that Dass considered a set-up for failure. Significantly, regardless of the fact that Yost was reassigned to the third-grade class that Dass would have preferred, like Dass, Yost was also non-renewed at the end of the 2006-07 school year.

between her grievance[14] and her termination.  *Id.* at 593.  Under the indirect method, Dass must

show that "she engaged in statutorily protected activity, performed her job to her employer's

legitimate expectations, suffered an adverse employment action, and was treated less favorably

than similarly situated employees who did not engage in that protected activity."  *Everroad v.*

*Scott Truck Sys., Inc.*, 604 F.3d 471, 481 (7th Cir. 2010).

It is unclear whether Dass proceeds under the direct or indirect method.  In any event,

Dass argues that "Jeske's attempts to negate Dass's grievance victory and prevent her from

returning to Casals, memorialized in fourteen emails to six different Board employees over

thirteen days, are evidence of Jeske's retaliatory intent that must be considered by the jury."

(Dkt. 39- Dass's Br. in Opp. to Summ. J. at 8.)  Dass's retaliation claim fails for many of the

same reasons that her discrimination claims failed.  Dass presents no direct evidence that she was

terminated in retaliation for filing a grievance; again, there is plenty of evidence that Jeske

terminated Dass on account of her poor performance.  As with her discrimination claims, Dass

cannot prevail under the indirect method either because she cannot establish that she was

meeting legitimate employment expectations.  Accordingly, her retaliation claim must fail.[15]

### III.    Disability Discrimination

Dass next argues that she was terminated because of her disability in violation of the

Americans with Disabilities Act ("ADA").  Under the ADA, an employer may not discriminate

"against a qualified individual with a disability because of [her] disability."  42 U.S.C. §

12112(a); *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 601 (7th Cir. 2009).  Dass may establish a

---

[14] The parties agree that Dass's grievance constitutes a protected activity for the purposes of her Title VII retaliation claim.

[15] Dass also argues that Defendants retaliated against her by placing her in a seventh-grade classroom that would ensure her failure.  As discussed above, Dass's assignment to teach seventh grade is not a materially adverse employment action.  Therefore, the Court's analysis of Dass's retaliation claim is limited to whether Defendants retaliated against her by terminating her employment.

claim for ADA discrimination under either the direct or indirect method. *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004). Under the direct method, which is akin to the direct method associated with Title VII discrimination claims, Dass must present direct or circumstantial evidence that she was terminated because of her disability. *Id.* Under the indirect method, Dass must establish a *prima facie* case by demonstrating that: (1) she is disabled under the ADA; (2) she was meeting her employer's legitimate employment expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees without disabilities were treated more favorably. *Lloyd*, 552 F.3d at 601.

Dass claims that her doctor placed her on bed rest in response to chest pains, dizziness, and left arm pain, which substantially limited her ability to work. The only accommodation that Dass requested, medical leave from December 4, 1006 until June 18, 2007, was granted by the Board. However, she claims that Defendants took her disability and leave into account when deciding to terminate her. Dass believes that her disability discrimination claim should survive summary judgment on the basis of two pieces of evidence: (1) Given that she went on leave on December 4, and Jeske non-renewed her in either late February or early March, a reasonable jury could infer from the "suspect timing" that she was terminated because of her disability; and (2) Jeske knew about her disability because she was copied on the Board's letter approving Dass's medical leave. The second piece of evidence certainly does not qualify as direct evidence that Dass was terminated because of her disability. With respect to the first piece of evidence, suspicious timing alone does not normally create an issue of material fact as to causation unless "the adverse action followed on the heels of the employer's discovery of the employee's disability." *Buie*, 366 F.3d at 506-07. The timing was not so immediate here, and moreover, Dass ignores the fact that principals are afforded a limited window within which they may non-

renew teachers for the following school year.  Dass does not dispute the fact that Jeske operated

within this window to non-renew her along with the others non-renewed for the 2007-08 school

year.  Dass has not presented direct evidence that she was terminated because of her disability,

nor can she prevail under the indirect method because she cannot establish that she was meeting

legitimate employment expectations.  Accordingly, Dass's ADA claim fails.


**CONCLUSION**

        For the reasons stated above, Defendants' motion for summary judgment is GRANTED

as to Counts I-IV.


                              Enter:
                              /s/ David H. Coar

                              _____
                              David H. Coar
                              United States District Judge


**Dated:** November 12, 2010